**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION**


| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | NO. 2:06-CR-166 |
| | ) | |
| JIMMIE L. COLLINS, | ) | |
| | ) | |
| Defendant. | ) | |


**OPINION AND ORDER**

This matter is before the Court on: (1) Defendant Jimmie L. Collins' Motion for Return of Property (DE# 26), filed on February 16, 2007; and (2) Defendant Jimmie L. Collins' Motion to Suppress Evidence Taken From Vehicle and Motel (DE# 36), filed on April 2, 2007.  For the reasons set forth below, these motions are **DENIED**.


BACKGROUND

Defendant, Jimmie L. Collins, was charged in a one-count indictment with using the internet in an attempt to persuade a female minor to engage in sexual activity, in violation of 18 U.S.C. section 2422(b).

In his motion for return of property, Defendant has moved for the return of his laptop computer, which he argues was taken in

-1-

violation of his Fourth Amendment Rights.   In his motion to suppress, Defendant has moved an order suppressing the Government's use at trial of an IPOD, Motel 6 receipt and computer "thumb drive" taken from his employer's Ford van as well as warming lubricant and a box of condoms taken from a room he rented at Motel 6, which he argues were also seized in violation of his Fourth Amendment rights.

The Court held evidentiary hearings regarding these matters on May 24, and June 4, 2007, at which Matthew Devine, a police detective with the City of Lafayette, Thomas Knoll, a special agent with the United States Secret Service, Wayne Gault, a special agent with the United States Secret Service, Lawrence Brown, an agent with the United States Secret Service, Alejandro Mantica, an agent with the United States Secret Service, Brian Simkins, Defendant's 21 year old son, and Ronda K. Simkins, Defendant's girlfriend, testified.   The parties submitted supplemental briefing following these hearings.   In making the following findings of fact, the Court considered the credibility of the witnesses.


FINDINGS OF FACT

Defendant, Jimmie L. Collins, engaged in numerous internet chat conversations with Matthew Devine, a Lafayette Police Officer,

posing as a 13 year old female named Nikki[1], using the chat name of "nikkifforsure." (Tr. Vol. I, pp. 4-5). Officer Devine was posing as Nikki as part of a state and federal sting known as "Operation Safe Child." (Tr. Vol. I, p. 4). During the course of these chats, Collins agreed to meet Nikki at a small strip mall in Lafayette, Indiana on August 18, 2006. (Tr. Vol. I, pp. 7-8). During one of Collins' chats with Nikki, Collins indicated that he would bring condoms, a "nightie," and possibly an iPod to their scheduled meet. (Tr. Vol. I, pp. 25-26). The strip mall included businesses such as an athletic store, a pizza restaurant and an ice cream shop. (Tr. Vol. I, p. 7). There was also an abandoned K-Mart store about 100 yards away. (Tr. Vol. I, p. 7). Officer Devine selected this meeting place because it allowed an unobstructed view of the person at the scene, provided for easy access to that person once he arrived and because the area did not have a lot of citizens or traffic to interfere with or be put in harms way by the investigation. (Tr. Vol. I, pp. 10-12).

On August 18, 2006, more than an hour ahead of the agreed meeting time, Collins drove a 2005 white Ford truck he had previously described in a chat to Nikki to the agreed meeting place. (Tr. Vol. I, p. 13). Federal agents working with Detective

---

[1]During the hearings and through their written submissions, the Government referred to the 13 year old female as Sammi, while the Defendant called this individual Nikki. For clarity, the Court will use "Nikki" throughout this opinion.

Devine spotted the 2005 white Ford truck and ran the license plate. (Tr. Vol. I, p. 14).   The van was registered to Chester Pools, Inc., of New Albany, Indiana.  (Tr. Vol. I, p. 14).  Collins then left the area and returned a little more than one hour later.  (Tr. Vol. I, p. 18).  When Collins returned, he drove the van toward a female officer dressed as the 13 year old Nikki and parked the van halfway in a parking space, wherein the back half of the vehicle was hanging out of the space, obstructing the aisle where cars would drive.  (Tr. Vol. I, pp. 18, 40, 50-51).

Collins identified himself as "Jim" and the female officer identified herself as "Nikki."  (Tr. Vol. I, p. 18).   The female officer then gave the arrest signal and Collins was removed from the van and handcuffed.   (Tr. Vol. I, pp. 19, 49).   Collins was patted down and police recovered a hotel key in Collins' front pant pocket.  (Tr. Vol. I, p. 75).  Collins was then transported to the West Lafayette Police Department, which was located nearby.  (Tr. Vol. I, pp. 19, 20, 40).   The process of handcuffing and transporting Collins to the West Lafayette Police Department took approximately 2-3 minutes.  (Tr. Vol. I, pp. 19, 40).  At the West Lafayette Police Department, Collins was read his Miranda rights and then he requested legal counsel, which stopped the interview process. (Tr. Vol. I, pp. 23, 49-50).

Officers took the van Collins was driving to the garage in the police station and it was searched by Special Agents Wayne Gault

-4-

and Brown within a few minutes of its arrival.  (Tr. Vol. II, pp. 24, 88, 93).  The garage area was secured and there was no concern by any of the officers or agents that any evidence would be taken or lost from the van or that the van would be driven away or taken by someone other than a law enforcement agent.  (Tr. Vol. I, p. 56; Tr. Vol. II, p. 91).  The van was brought to the garage under the West Lafayette Police Department impound rules.  (Tr. Vol. II, pp. 90, 101).

Before the search of the van, Agent Noll had discussions with Officer Devine regarding Devine's online chats with Collins.  Based upon those conversations, Agent Noll determined evidence of a crime would likely be in the van; namely, condoms, an iPod and a computer.  (Tr. Vol. I, pp. 56-57).  Prior to the arrival of Collins' on the scene and before his arrest, Agent Noll instructed Agent Gault to look for condoms and an iPod in the van.  (Tr. Vol. II, p. 87-89).  Agent Brown was also told that there might be an iPod involved.  (Tr. Vol. II, pp. 104-07).  Agent Gault searched the side compartments of the van which mainly contained tools and equipment for pool installation.  (Tr. Vol. II, p. 96).  The agents searched the front interior of the van and found an iPod, a hotel receipt to the Motel 6 in Lafayette, which showed a check in date of August 18, 2006 and a check-out date of August 19, 2006, and a thumb drive on the key ring.  (Tr. Vol. II, pp. 93-94, 108-09).  After the search, the van was impounded per West Lafayette Police

Department policy and towed to a private towing facility for safekeeping. (Ex. D).

Agent Noll and Officer Devine went to the Motel 6 in Lafayette, the motel listed on the receipt taken from the van driven by Collins. (Tr. Vol. I, pp. 58-59; Ex. D). When they got to the Motel 6, they spoke with Dedre Ellis, the desk clerk, who informed them that Collins had checked in to the hotel that day and was to check out on August 19. (Tr. Vol. I, pp. 30, 60; Ex. C; Ex. D). The officers asked the Motel 6 employees to contact them if they recovered any abandoned property in Collins' room after the scheduled check-out time. (Tr. Vol. I, p. 31).

The next day, on August 19, 2007, after Collins' scheduled check-out time, Officer Devine and Agent Noll returned to the Motel 6. (Tr. Vol. I., pp. 34, 43, 67-68, 77). The agents spoke with the motel maid in the hotel hallway who had cleaned Collins' room. (Tr. Vol. I, pp. 34, 43; Ex. D). The maid informed the agents that she had found a box of condoms and a bottle of lubricating oil, including a receipt for those items, all of which she had inside a sack on her cleaning cart. (Tr. Vol. I, pp. 35-36, 68, 77; Ex. D). She gave these items to the officers. (Tr. Vol. I, p. 68).

Jimmie Collins' girlfriend, Ronda Simkins, and his 21 year-old son, Brian Simkins, all reside together in Whiteland, Indiana. (Ex. A; Ex. B). Brian formerly served as a captain in the Marion County Sheriff's Cadet Program for five years. (Tr. Vol. II, p.

168).  From that experience, Brian believes that he gained a fair understanding and knowledge of law enforcement.  (Tr. Vol. II, p. 168).  As a result of that program, Brian and some inclination to become a police officer.  (Tr. Vol. II, p. 168).  Brian also had a good friend, Douglas Hunter, who was a local police officer and also Brian's advisor in the cadet program.  (Tr. Vol. II, p. 168).  On the night of August 18th, Brian talked to his friend Officer Hunter due to his father not returning home from work.  (Tr. Vol. II, pp. 169-70).  Brian was advised to call the Greenwood Police Department, which he did.  (Tr. Vol. II, p. 153).  Officer Nicholas Dine of the Greenwood Police Department visited Brian on the night of August 18th as well as the following day trying to get information about Mr. Collins.  (Tr. Vol. II, p. 170).  On Saturday, August 19th Ronda Simkins, Mr. Collins' girlfriend and Brian's mother, filled out a missing person's report for Mr. Collins with the Greenwood Police Department.  (Tr. Vol. II, p. 171).  On Sunday, Brian again talked to his friend, Officer Hunter, regarding his father's disappearance.  (Tr. Vol. II, p. 172).  This was the third or fourth time that Brian had contact with local law enforcement surrounding his father's disappearance.  (Tr. Vol. II, p. 172).

On either August 18 or 19, 2006, Agent Noll asked Agent Mantica to find out if there was a computer at Collins' house.  (Tr. Vol. II, p. 115).  According to Brian, Agent Mantica was the

-7-

first to make contact by calling Brian on his cellular telephone. (Tr. Vol. II, p. 155, 174). According to Agent Mantica, though, Brian was the one who initiated contact by leaving a voice message at Agent Mantica's office. (Tr. Vol. II, p. 115-16). Regardless of who initiated the call, during their first conversation, Agent Mantica informed Brian that Jimmie Collins was arrested and Agent Mantica asked if there were any computers in the home. (Tr. Vol. II, pp. 119, 155-56). Brian told Agent Mantica that there were two computers in the home, one belonged to his father, Jimmie Collins, and the other belonged to the family, which was primarily used by Brian. (Tr. Vol. II, pp. 119, 156). Neither Brian nor his mother, Ronda Simkins, used Collins' computer. (Tr. Vol. II, pp. 156-57, 187, 197).

Agent Mantica asked Brian to read off the serial number of Jimmie Collins' computer. (Tr. Vol. II, pp. 119-120, 156). While Brian testified that Agent Mantica instructed him to handle Jimmie Collins' computer with a rag and then set it aside in a towel without touching it, (Tr. Vol. II, pp. 156, 157), Agent Mantica stated that he did not tell Brian how to handle the computer. (Tr. Vol. II, p. 120). From talking with Brian, Agent Mantica knew that Collins guarded his computer and did not allow anyone to use it. (Tr. Vol. II, pp. 124-25). Agent Mantica then asked if he could come over to the residence and pick up Collins' computer, to which Brian "told him he could." (Tr. Vol. II, pp. 156, 123). Although

-8-

Brian admits that Agent Mantica did not threaten him, Brian testified that the sound of Agent Mantica's voice seemed threatening. (Tr. Vol. II, p. 176). Agent Mantica told Brian that he would be there to pick up the computer within a few hours. (Tr. Vol. II, p, 156). Brian told Agent Mantica that he would wait at the house for Agent Mantica to arrive. (Tr. Vol. II, pp. 123- 156).

Accordingly to Brian, one of his police officer friends told him to be in fear of the secret service breaking into his house and destroying it. (Tr. Vol. II, pp. 177-78). Brian's friend told him that he has seen secret service agents break into a house on a few years ago and "trash it." (Tr. Vol. II, p. 177). As such, Brian was advised to have people present when Agent Mantica arrived "just in case." (Tr. Vol. II, p. 157). Brian testified that he called family members and his best friend and that these individuals came over to his house awaiting Agent Mantica's arrival. (Tr. Vol. II, p. 157). However, Brian never called the Greenwood Police or requested any other law enforcement agency to be at the house in anticipation of Agent Mantica's arrival. (Tr. Vol. II, p. 178). In addition, Brian never told Agent Mantica that he did not want to meet, nor did Brian offer to take the computer to local law enforcement so that Agent Mantica could pick it up there. (Tr. Vol. II, p. 179). Ultimately, Agent Mantica failed to show up at Brian's house within the two hour window, so Brian left his house. (Tr. Vol. II, p. 157).

-9-

At approximately 10 p.m. on August 21, 2006, Agent Mantica called Brian and apologized from not making it to Brian's house as scheduled.  (Tr. Vol. II, p. 127).  Agent Mantica asked if they could meet that evening somewhere in the vicinity of Interstate 65. (Tr. Vol. II, p. 127).  Brian suggested they meet at a White Castle restaurant close to Interstate 65.[2]  (Tr. Vol. II, pp. 127, 159). Brian never asked Agent Mantica what would happen if he refused to turn over the computer.  (Tr. Vol. II, p. 128).[3]  And, because of

---

[2]  Even though it is undisputed that Brian selected the White Castle restaurant as a meeting place, there is conflicting testimony as to how that decision was arrived at.  According to Brian, after this conversation with Agent Mantica ended that night, he called his police officer friend, who informed Brian to meet the Secret Service agents in a well-lit area with a lot of patrons.  (Tr. Vol. II, p. 159).  Then Brian spoke with his mother and, based upon talking to his police friend and mother, Brian made the decision to meet at the White Castle restaurant in Greenwood, Indiana.  (Tr. Vol. II, p. 159).  Brian's version of events would require him to speak with Agent Mantica twice that night to confirm the meeting place.  Contrary to that scenario, Agent Mantica testified that the decision to meet at White Castle was made during the initial call that night.  Notably, Agent Mantica's testimony is fully credited.  Supporting Agent Mantica's version of events was the testimony of Ronda, who stated that she was with Brian during his conversation with Agent Mantica, and selecting the White Castle meeting place was solely Brian's decision.  (Tr. Vol. I, p. 202).  Both Agent Mantica and Ronda's version of events discredit Brian's claim that he made an intervening call to his officer friend.

[3]  Brian testified that Agent Mantica said Brian could get arrested if he did not give up the computer that night.  (Tr. Vol. II, p. 158).  Brian also said that Agent Mantica informed him that law enforcement would get a search warrant and break into the house and get the computer if Brian refused to give up the computer.  (Tr. Vol. II, p. 158).  Brian's testimony in this regard is not credited.  To start, it conflicts with Agent Mantica's testimony.  Second, it is incredible as it weighs against the weight of the evidence.  From all indications Brian

her concern about her son being arrested, Ronda insisted on going with Brian to the restaurant.  (Tr. Vol. II, p. 202).  Brian did not contact any other law enforcement to notify them of this meeting.  (Tr. Vol. II, p. 181-82).

After speaking with Agent Mantica, Brian and Ronda went to their house, picked up the computer, and drove to the White Castle restaurant.[4]  (Tr. Vol. II, p. 160).  Brian testified that he drove to the restaurant, (Tr. Vol. II, p. 183), but Ronda claims that she drove there.  (Tr. Vol. II, p. 203).

After speaking with Brian, Agent Mantica called Secret Service Agent Christian Ebel-Orr and asked if he would accompany Agent Mantica to the White Castle as a witness.  (Tr. Vol. II, p. 128).  The agents drove separately and were casually dressed.  (Tr. Vol.

---

was quite agreeable to hand over the computer to law enforcement officers.  He agreed to meet with them on multiple occasions, including meeting them at his home.  Moreover, from Brian's experience with law enforcement and active discussions with law enforcement officers surrounding his father's disappearance, it is incredible to believe that Agent Mantica made this threat and Brian never reported it to local law enforcement.  Tellingly, when Agent Mantica asked Brian where he wanted to meet to hand over the computer Brian suggested a local restaurant instead of a police station.

[4]  Brian testified that he told his mother that he was afraid that he would be arrested if he failed to turn over the computer.  (Tr. Vol. II, pp. 159, 188, 202).  Ronda testified that she decided to go to the White Castle with Brian because she was scared that he was going to be arrested.  (Tr. Vol. II, pp. 202-03).  Neither of these accounts is credible, though, as there was no credible evidence presented supporting their reasonable fear of Brian being arrested.

II, pp. 128-29).  Brian told Agent Mantica that Brian's mother would be accompanying him to the meeting place.  (Tr. Vol. II, pp. 129-130).  After Agent Mantica and Agent Ebel-Orr arrived, a vehicle containing a white male and a white female drove into the parking lot and parked next to the agents' vehicles.  (Tr. Vol. II, p. 130).  These two individuals got out of the car and identified themselves as Brian and Ronda Simkins.  (Tr. Vol. II, p. 130).  Agent Mantica, who was already outside of his vehicle, then identified himself to Brian and Ronda and showed them his Secret Service Identification.[5]  (Tr. Vol. II, pp. 130, 133).  Agent Mantica had a conversation with Brian about his father's business trips, on which Brian would sometimes accompany his dad.  (Tr. Vol. II, p. 133).  Brian also discussed his desire to be a police officer with Agent Mantica.  (Tr. Vol. II, p. 133).  At this point in time, Brian was upset and Ronda was furious that Mr. Collins had been arrested.  (Tr. Vol. II, pp. 133-34).  Agent Mantica never told Brian or Ronda to move from in front in their own car to the

---

[5]  According to Ronda, Agent Mantica never identified himself.  (Tr. Vol. II, p. 204).  Brian testified that Agent Mantica did verbally identify himself, but never showed Brian any identification.  (Tr. Vol. II, pp. 161, 204).  These accounts are not credible.  To start, they conflict with each other. Moreover, the testimony is in conflict with Agent Mantica's testimony.  Agent Mantica testified that Ronda and Brian's claim that Agent Mantica did not show them identification was a lie. (Tr. Vol. II, p. 142).

front of Agent Mantica's car.[6]  (Tr. Vol. II, p. 142).

Agent Mantica then asked Brian if Ronda if they had brought the laptop computer, to which they said that they had.  (Tr. Vol. II, p. 134).  Agent Mantica asked if Brian and Ronda would voluntarily surrender the computer that belonged to Collins', and they agreed to do so.  (Tr. Vol. II, p. 135).  They informed Agent Mantica that the computer was in the backseat of their vehicle. (Tr. Vol. II, p. 135).  Brian opened the door of his vehicle and allowed Agent Ebel-Orr to retrieve the computer from the backseat.[7] (Tr. Vol. II, pp. 135, 143).  During this encounter, neither Brian nor Ronda refused to voluntarily hand over the computer or expressed any signs of unwillingness to hand over the computer.[8]

_____

[6]This conflicts with Brian's claim that Agent Mantica instructed him to step away from his car and stand in front of Agent Mantica's car.  (Tr. Vol. II, p. 161).  Based on the credibility of the witnesses, this Court credits Agent Mantica's version of events.

[7] Brian testified that he asked whether he should get the computer out of the car, but Agent Mantica told him no, not to move.  (Tr. Vol. II, p. 163).  Brian testified that Agent Mantica then directed Christian [Agent Ebel-Orr] to get the computer from the Simkins' car.  (Tr. Vol. II, pp. 163, 204).  Brian testified that Christian pulled up his shirt to let Brian see his firearm. (Tr. Vol. II, p. 164).  This testimony implying that Agents Mantica and Ebel-Orr forcefully took the computer by intimidation is not credited.  It conflicts with the agents' testimony, which this Court finds to be credible.  In addition, it is incredible as it runs contrary to the weight of the evidence.

[8] Brian testified that he kept asking the agents "why, why, why.  Why he had to do this," and that his mother told the agents that she did not want to turn over the computer.  (Tr. Vol. II, pp. 185, 186).  However, this testimony is not credited as it runs contrary to Agent Mantica and Agent Ebel-Orr's testimony,

-13-

(Tr. Vol. II, p. 143).  At the conclusion of the meeting, Ronda signed a consent form saying that she voluntarily surrendered the computer to the Secret Service Agents in the presence of her son, Brian.  (Tr. Vol. II, p. 214).  The agents merely wanted to seize the computer as evidence, it has not been searched as the officers do not intend to search it without first obtaining a warrant.  (Tr. Vol. II, p. 138).

Through Brian's training in the cadet program, he knows that documenting alleged misconduct is important.  (Tr. Vol. II, pp. 186-87).  Nevertheless, Brian never filed a police report about this incident or brought it to any law enforcement's attention in any other way.  (Tr. Vol. II, p. 186).  Brian did talk to his father testifying at the suppression hearing and before making the affidavit (Ex. A).  (Tr. Vol. II, p. 187).  Ronda also spoke with Jimmie Collins before she testified and before she made her affidavit (Ex. B).  (Tr. Vol. II, p. 215, 217).

CONCLUSIONS OF LAW

Warrantless Search of Jimmie Collins'
Work Van was Lawful Under the Automobile Exception

Defendant believes that the warrantless search of the Ford van

---

which is credible.  Also, Brian's version goes against the weight of
the evidence.  Indeed, Brian testified that he never told the
agents that he did not want to turn over the computer, (Tr. Vol.
II, pp. 185-86), and Ronda signed a voluntary consent form to
turn over the computer.

violated his Fourth Amendment rights.   In coming to this conclusion, Defendant makes several distinct arguments, analyzing several different warrantless search and seizure doctrines. However, only one is of consequence; the automobile exception.

While the Fourth Amendment generally requires the issuance of a warrant to precede a search, there are several exceptions to the warrant requirement. *Stanley v. Henson*, 337 F.3d 961, 963 (7th Cir. 2003). One such exception is the automobile exception: "[T]he 'automobile exception' to the Fourth Amendment's warrant requirement . . . allows police to search a vehicle without a warrant when they have probable cause to believe it contains contraband or evidence of a crime." *United States v. Wimbush*, 337 F.947, 950 (7th Cir. 2003)(*citing Alabama v. White*, 496 U.S. 325, 332 (1990)).

Defendant makes two challenges to the use of the automobile exception.   First, Defendant argues that there was no probable cause to believe the van Collins was driving when he was arrested contained contraband or evidence of a crime. However, the facts of this case clearly demonstrate that probable cause existed for the search. See *Illinois v. Gates*, 462 U.S. 213 (1983)(establishing a totality of the circumstances test by which to determine whether probable cause exists). The officers had acquired information from Defendant's internet chats that he was going to bring condoms, an iPod and a black nightie to his liaison with Nikki. Thus, based on

Defendant's own statements, officers had was probable cause that Defendant brought these items with him to meet Nikki on August 18, 2006.  A search of Collins' person failed to reveal any of these items.  Therefore, there was sufficient evidence to cause a reasonably prudent person to believe that a search of the van would uncover these items, which may be used as evidence of Defendant's crime (i.e. violating 18 U.S.C. § 2422(b)).  *Id.* at 238.

Second, Defendant argues that, even assuming there was probable cause to believe contraband was in the van, the automobile exception is limited to situations in which the automobile is mobile.  And because in this case the van was impounded and not mobile, Defendant argues that the automobile exception does not apply and that the Government was required to obtain a search warrant prior to searching the van.  This argument is foreclosed by the Seventh Circuit's opinion in *United States v. Matthews*, 32 F.3d 294, 298-99 (7th Cir. 1994).  In *Matthews*, the court explained that, although early holdings in the Supreme Court identify the automobile's inherent mobility as justifying a warrantless search, the exception has since been expanded and, because of the lower expectation of privacy in automobiles, "the mobility of the vehicle is not essential to the automobile exception." *Id.*  Thus, because there was probable cause to believe Collins' work van contained contraband, a search of the vehicle was appropriate under the automobile exception.

<u>Officers Lawfully Retrieved Items From Motel</u>

Defendant next challenges the Government's warrantless seizure of the condoms and lubricant from the maid at the Motel 6.  This challenge is twofold: first, Defendant claims that he had an expectation of privacy in his motel room and did not abandon that property and, thus had a legitimate expectation of its return.  Second, Defendant claims that the maid searched his room under the direction of the officers, thus violating his Fourth Amendment rights.

Jimmie Collins no longer had
<u>any privacy interest in the motel room</u>

Defendant's first argument is countered by the Seventh Circuit's decision in *United States v. Akin*, 562 U.S. 459 (7th 1977).  The court ruled:

> A hotel room can clearly be the object of the Fourth Amendment protection as much as a home or an office.  Fourth Amendment protection, however, is dependent on the right to private occupancy of the room since at the conclusion of the rental period, the guest has completely lost his right to use the room and any privacy associated with it.  At the conclusion of the occupancy period, the hotel manager man enter the room or consent to its search.  The question of intentional abandonment is, therefore, a necessary inquiry only during the rental period when defendant has sufficient control over the premises to establish a right to privacy therein.

*Id.* at 464(citations and quotations omitted).

It is undisputed that the agents arrived at the Motel 6, spoke

-17-

with the maid and retrieved the box of condoms and lubricant after the rental period expired for Defendant's room.  Because the rental period expired, Defendant no longer had a privacy expectation over the room.   *Id.*   Therefore, his first contention is without merit.

### There is no evidence that the Motel 6 maid was acting as a government instrument or agent

Defendant also argues that maid going into his room and taking the box of condoms and lubricant violated his Fourth Amendment rights.  Even assuming the maid entered the room before Defendant's check-out time, this argument would fail too.  "A search or seizure by a private party does not implicate the Fourth Amendment. However,  the Fourth Amendment does apply to a search or seizure by a party (even if otherwise a private party) who is acting as an 'instrument or agent' of the government."  *United States v. Shahid*, 117 F.3d 322, 325 (7th Cir. 1997)(citations omitted).   Two important factors analyzed to determine whether a private party is acting as an "instrument or agent" are: (1) whether the government knew of and acquiesced in the intrusive conduct; and (2) whether the private party's purpose in conducting the search was to assist law enforcement agents or to further [her] owns ends.   *Id.* Notably, the defendant bears the burden of proving that the private party was acting as an "instrument or agent."  *Id.*

Defendant has failed to meet his burden that the maid at Motel 6 was acting as an "instrument or agent" of the government when she

-18-

picked up the box on condoms and lubricant from Defendant's room and placed those items onto her cart. The agents did not instruct either the maid or any of the Motel 6 staff to enter Defendant's room or take any items from Defendant's room. All the agents told the workers at Motel 6 was to contact them if "anything had been left behind in the room". (Tr. Vol. I, p. 31), and further informed the Motel 6 management that they would be the next day to check for any abandoned property. (Ex. D, p. 2). Thus, the only direction that Motel 6 employees were given was to call the agents if Defendant abandoned any property, which, ironically, the Motel 6 workers did not do. The evidence shows that the Motel 6 maid entered Defendant's room, found the left items, and put those items on her cart in the ordinary course of her duties. Therefore, her actions cannot be seen as those of an "agent or instrument" of the government.


Seizure of Laptop Computer Was Lawful Because
Ronda and Brian had Authority to Hand it Over
to Law Enforcement, Which They Did Voluntarily

     Defendant argues that neither Ronda nor Brian had authority to use the computer and, therefore, they did not have authority to hand over the computer to law enforcement officers. As such, Defendant argues, the warrantless seizure of the computer violated his Fourth Amendment rights. Alternatively, even if Ronda or Brian had authority to give the computer to law enforcement officers,

Defendant argues that they did so involuntarily because they were coerced to do so by law enforcement officers.

Brian and Ronda had authority to turn computer over to officers

The first question to be addressed is whether Brian and/or Ronda had authority to consent to the handing over of the computer to law enforcement agents without a warrant.

A person can waive his Fourth Amendment rights and, therefore, no warrant is required where a defendant consents to a search or seizure. *United States v. Matlock*, 415 U.S. 164, 171 (1974). This exception to the warrant requirement extends to consent legitimately obtained from a third party. *Id.*; *United States v. Duran*, 957 F.2d 499, 504 (7th Cir. 1992). Third-party consent exists when that third party has actual or apparent authority over the area to be searched. *United States v. Aghedo*, 159 F.3d 308, 310 (7th 1998). "Third-party consents to search the property of another are based on a reduced expectation of privacy in the premises or things shared with another. When an apartment, for example, is shared, one ordinarily assumes the risk that a co-tenant might consent to a search, at least to all common areas and those areas to which the other has access. A third-party consent is also easier to sustain if the relationship between the parties-parent to child, . . . spouse to spouse . . .- is especially close." *United States v. Ladell*, 127 F.3d 622, 624 (7th Cir.

-20-

1997).  Common authority rests on "mutual use of the property by persons generally having joint access or control for most purposes."  *Matlock*, 415 U.S. at 171 n.7.

It is undisputed that Defendant's laptop was his alone and neither Brian nor Ronda used it.  Based on this fact, Defendant relies on *United States v. Rodriguez*, 888 F.2d 519 (7th Cir. 1989), to support his argument that neither Brian nor Ronda could consent to handing over the computer to law enforcement.  In *Rodriguez*, the defendant was a janitor working and living in a union hall, who sold drugs on the side.  After a sting operation, the defendant was arrested at the union hall and taken to the police station.  Agents remaining in the union hall then corralled the defendant's wife, who had authority to let them into the janitors' quarters.  The agents searched the room and opened a briefcase on which the defendant's name was written.  In the briefcase, agents found evidence of a crime, including documents and money.

The court of appeals had no trouble finding that the wife's consent was sufficient to allow law enforcement officer to search the room she shared with the defendant, and for officers to look at and seize items, including closed-containers, in the room.  *Id.* at 524.  However, while the defendant's wife's consent to search the janitors' room was sufficient to allow officers to seize closed containers in the room, it was not necessarily sufficient to allow officers to preform a search of those closed containers.  *Id.* at

-21-

523. As such, the court of appeals remanded the case to determine
whether the wife had authority to consent to the opening of the
briefcase. *Id.* at 524-25.

*Rodriguez* does little to help Defendant because neither Ronda
nor Brian allowed officers to search the contents of the computer.
If this had been the case, the search of the contents of the
computer here would have been analogous to the search of the closed
briefcase in *Rodriguez*. However, neither Brian nor Ronda permitted
or allowed law enforcement to search the contents of the computer.
In fact, the agents have testified that the computer has yet to be
searched and they will attempt to procure a search warrant before
searching the computer. Thus, Defendant's expectation of privacy
in the contents of the computer remains intact.

Although *Rodriguez* does not support Defendant's position, it
is nevertheless helpful to the disposition of this issue.
*Rodriguez* taught that if a person has authority to consent to the
search of a particular area, officers can search that area and
seize existing closed-containers, even if the person giving consent
to search the premises does not have authority to consent to the
search of those closed containers. *Id.* ("The consent is adequate to
justify looking at (and seizing) materials found on the "desk.").
Thus, under *Rodriguez,* if Brian or Ronda had authority to consent
to the search of their home, then officers could search the home
and seize the computer even if Ronda and Brian did not have

authority over the computer.

Thus, this Court must determine whether Ronda or Brian had authority to give consent to search the premises where the computer was located, which is not a difficult determination to make.  There is no question that both Ronda and Brian could give consent to search their home, where the computer was located.  Brian and Ronda occupied the house with Defendant and had a close personal and familial relationship[9] with Defendant.  See *Duran*, 957 F.2d at 504-05(holding that " a spouse presumptively has authority to consent to a search of all areas of the homestead. . .").  Defendant never argued or presented evidence that the area where the computer was located was under his exclusive control.  *Id.*(noting that presumption can be rebutted only by showing that nonconsenting spouse was denied access to the particular area of the homestead).  Thus, both Brian or Ronda would have actual authority to permit law enforcement to search the house for the computer.  *Ladell*, 127 F.3d 624; *Matlock*, 415 U.S. at 171 n.7; *Duran*, 957 F.2d at 504-05.  Would this have happened, law enforcement officers could have seized the computer upon seeing it.  *United States v. Jacobsen*, 466 U.S. 109 (1984)(citing *United States v. Place*, 103 S.Ct. 2637, 2641 (1983)(noting that government agents may lawfully seize a package

---

[9] Although Ronda was Defendant's long-time girlfriend instead of wife, this relationship is closely analogous to that of a husband and wife.  Indeed, Ronda has been living with Defendant for nearly 21 years. (Tr. Vol. II, p. 190).

to prevent loss or destruction of suspected contraband); *Rodriguez*, 888 F.2d at 524-25.

Even assuming that Brian and Ronda did not have access to the area where the computer was located in the house, such a fact was never relayed to law enforcement.  Thus, even if Brian and Ronda lacked actual authority, they nevertheless had apparent authority to hand the computer over to authorities.  *Illinois v. Rodriguez*, 497 U.S. 177, 185 (1990)(noting that a warrantless search is valid where police reasonably believe that the consenting party had the requisite control over the premises).

This Court can find no legitimate reason to distinguish the situation of Brian or Ronda permitting officers to enter the home in order to search for and seize the computer from the scenario of Ronda and Brian taking the computer from the home and handing the computer over to law enforcement officers.  The point remains fundamentally the same: Defendant shared the dwelling with Brian and Ronda and, therefore, had a diminished legitimate expectation of privacy in the premises where the computer was located. *Matlock*, 415 U.S. at 171 n.7; *Ladell*, 127 F.3d at 624.  As such, Defendant assumed the risk that either Ronda or Brian may allow a search of the home or consent to the seizure of items within the home.  The reasonableness of the seizure remains unchanged whether Brian or Ronda allowed officers to come onto the premises to search for the computer, or whether Brian or Ronda take the computer from

-24-

that home and hand it over to authorities.

Notably, both parties focus primarily on Brian and Ronda's authority to use the computer.  However, because this case involves merely the seizure, not a search, of a closed-container located on a premises where a third-party has joint access, the Seventh Circuit's opinion in *Rodriguez* has taught that this is not the proper inquiry.  The proper inquiry is to determine whether Brian and Ronda had authority to consent to a search of the premises where the computer was located.  *Id.*(holding that a wife's consent to search a room over which she has authority allows officers to seize closed-containers in that room, even if the wife does not have authority to consent to the search of those closed-containers).  Because Brian and Ronda had authority to consent to a search of the premises where the computer was located, they also had the authority to take the computer from that premises and hand it over to law enforcement.


Brian and Ronda voluntarily turned over the computer

Defendant argues that, even if Brian and Ronda had authority to give third-party consent to turn the computer over to law enforcement, their consent was ineffectual due to the coercive tactics of the government agents.  Whether consent is voluntary is determined by looking at the totality of the circumstances.  *Schneckloth v. Bustamonte*, 412 U.S. 218, 248 (1973).  Factors to be

considered in determining "whether consent was freely given are the age, education and intelligence . . . of the person giving consent; whether physical coercion was used to obtain consent; and whether the person giving consent was in custody." *United States v. Grap*, 403 F.3d 439, 443 (7th Cir. 2005)(citation omitted). Also factored in is whether the officer advised the person asked to give consent of his right to refuse. *Id.* The burden of proving voluntariness of consent, by a preponderance of the evidence, is borne by the Government. *United States v. Basinki*, 226 F.3d 829, 833 (7th Cir. 2000).

Considering the totality of the circumstances, this Court finds that Agent Mantica properly obtained Ronda and Brian's voluntary consent to turn over the computer. Agent Mantica asked Brian if he would voluntarily surrender the computer, which Brian agreed to do. Ronda also agreed, even signing a voluntary consent form. While the Simkins presented testimony regarding their being threatened by law enforcement, that testimony has been wholly discredited. As such, there is no credible evidence in the record that any coercion was placed upon either Brian or Ronda by law enforcement officers. While it seems as though Agent Mantica failed to advise either Brian or Ronda of their right to refuse consent to hand over the computer, that does not undermine the voluntary nature of their consent. *Schneckloth*, 412 U.S. at 249; See e.g. *Grap*, 403 F.3d at 443(finding that failure to advise of

-26-

right to refuse consent is not dispositive).


CONCLUSION

     For the reasons set forth above, Defendant's motions are **DENIED**.



**DATED:  September 7, 2007          /s/RUDY LOZANO, Judge**
**                                   United States District Court**